# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

KRISTINA MARIE BAIR,        :

                                  :

        Plaintiff        :     **No. 3:14-CV-2116**

                                  :

        vs.                 :     (Judge Nealon)

                                  :

CAROLYN W. COLVIN, Acting   :

Commissioner of Social Security,   :

                                  :

        Defendant     :

## MEMORANDUM

On November 4, 2014, Plaintiff, Kristina Marie Bair, filed this appeal[1]

under 42 U.S.C. § 405 for review of the decision of the Commissioner of Social

Security denying her claim for disability insurance benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 400-403.  (Doc. 1).  The parties have fully

briefed the appeal.  For the reasons set forth below, the decision of the

Commissioner denying Plaintiff's application for DIB will be vacated.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on March 23, 2011, with

---

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2.  Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is

an alleged onset date of July 20, 2008.  (Tr. 15).[3]  This claim was initially denied

by the Bureau of Disability Determination ("BDD")[4] on July 19, 2011.  (Tr. 15).

On July 28, 2011, Plaintiff filed a written request for a hearing before an

administrative law judge.  (Tr. 15).  A video hearing was held on May 9, 2013,

before administrative law judge Reana Sweeney ("ALJ"), at which Plaintiff and

vocational expert, Brian Bierley ("VE"), testified.  (Tr. 15).  On May 22, 2013, the

ALJ issued a decision denying Plaintiff's claims because, as will be explained in

more detail _infra_, Plaintiff's impairments did not meet or medically equal any

impairment Listing and Plaintiff could perform light work with limitations.  (Tr.

15-23).

On July 1, 2013, Plaintiff filed a request for review with the Appeals

Council.  (Tr. 8).  On September 19, 2014, the Appeals Council concluded that

there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).

Thus, the ALJ's decision stood as the final decision of the Commissioner.

---

actually signed.

3.  References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on January 12, 2015.  (Doc. 10).

4.  The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

Plaintiff filed the instant complaint on November 4, 2014.  (Doc. 1).  On

January 12, 2015, Defendant filed an Answer and Transcript from the Social

Security Administration ("SSA") proceedings.  (Docs. 9 and 10).  Plaintiff filed

the brief in support of her complaint on February 19, 2015.  (Doc. 12).  Defendant

filed a brief in opposition on March 25, 2015.  (Doc. 13). On April 6, 2015,

Plaintiff filed a reply brief.  (Doc. 14).  The matter is now ripe for review.

Disability insurance benefits are paid to an individual if that individual is

disabled[5] and insured, that is, the individual has worked long enough and paid

─────────────────────

5. To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the date last insured.  It is undisputed that

Plaintiff meets the insured status requirements of the Social Security Act through

December 31, 2012.  (Tr. 17).

Plaintiff was born in the United States on July 20, 1973, and at all times

relevant to this matter was considered a "younger individual"[6] whose age would

not seriously impact her ability to adjust to other work.  20 C.F.R. §§ 404.1563(c);

(Tr. 217).

Plaintiff obtained her college degree in May of 2005, and can communicate

in English.  (Tr. 203, 205).  Her employment records indicate that she previously

worked as an income maintenance case worker, an office assistant, a work-study

library assistant, a work-study store associate, a customer service representative

for phone and mail order sales, a clerk at a retail and health food store, and a

supervisor at a bank.  (Tr. 222).

The records of the SSA reveal that Plaintiff had earnings in the years 1990

---

6. The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work. However, in some circumstances, we consider that persons age 45-
49 are more limited in their ability to adjust to other work than persons who have
not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

through 2008.  (Tr. 178).  Her annual earnings range from a low of eight hundred

two dollars and fifty cents ($802.50) in 2004 to a high of twenty-nine thousand six

hundred ninety-one dollars and fifty cents ($29,691.50) in 2007.  (Tr. 178).  Her

total earnings during those eighteen (18) years were two hundred fifty thousand

four hundred sixty-two dollars and seventy-nine cents ($250,462.79).  (Tr. 178).

Plaintiff's alleged disability onset date is July 20, 2008.  (Tr. 217).   The

impetus for her claimed disability is a combination of Fibromyalgia, depression,

chronic pain, and arthritis.  (Tr. 204).

In a document entitled "Function Report - Adult" filed with the SSA in July

of 2013,  Plaintiff indicated that she lived in an apartment with her family.  (Tr.

235).  When asked how her illnesses, injuries, or conditions limited her ability to

work, Plaintiff stated that: her ability to move was greatly limited by pain; that due

to Fibromyalgia, she was always tired, fatigued after minimal exertion,

uncomfortable, and frequently unable to thing clearly; and that her depression

"ha[d] added even more difficulties on top of all of this."  (Tr. 235).  Prior to her

illnesses, she was able to "move her body freely, think clearly, take walks, sleep

peacefully, travel, and maintain a job."  (Tr. 236).  From the time she woke up

until she went to bed, Plaintiff took her medication, ate breakfast, showered,

stretched as much as she could, ran errands and attended any scheduled

appointments, ate lunch, took a nap, worked on "basic chores," prepared dinner, and tried to clean.  (Tr. 236).  She did not take care of any other people, but did take care of her cat by feeding and brushing her and cleaning her litter box.  (Tr. 236).  In terms of personal care, she often felt "too bad to be able to wear clothes [because] loss of flexibility [made] it difficult to dress."  (Tr. 236).  Bathing also made her tired due to lack of flexibility, and often required hours to "recuperate" after doing so.  (Tr. 236).  Lack of flexibility also made it difficult to wash, dry, and brush her hair.  (Tr. 236).  She avoided shaving her legs frequently because she was too tired to do so.  (Tr. 236).  She was able to feed herself, but preparing meals was difficult due to standing; however, she was able to prepare breakfast and lunch daily for ten (10) minutes at a time each, and dinner every four (4) to five (5) times a week, for thirty (30) to sixty (60) minutes at a time each.  (Tr. 236-237).  She was able to do the laundry and dishes and straighten her house for a total of two (2) to three (3) hours daily, and thoroughly clean her house once a month.  (Tr. 237).  She required help putting things away because she had difficulty lifting, and stated that she often did these chores because they had "to be done."  (Tr. 237).  She did not do yard work because she did not have "the physical stamina to do it."  (Tr. 238).  Plaintiff shopped for groceries once a week for two (2) or more hours, spent three (3) to four (4) hours a week doing errands,

and occasionally shopped for clothes, presents, and personal items.  (Tr. 238).  She indicated that she was only able to walk about fifty (50) feet before needing to stop and rest, and needed to rest between ten (10) minutes and one (1) hour before resuming walking.  (Tr. 240).  When asked to check items that her illness, injuries, or conditions did not affect, Plaintiff did not check squatting, bending, reaching, sitting, kneeling, talking, hearing, seeing, understanding, following instructions, or getting along with others.  (Tr. 240).  Plaintiff did not need any assistive devices such as crutches, a walker, a wheelchair, a cane, or braces or splints.  (Tr. 241).

Regarding her concentration and memory, Plaintiff did not need special reminders to take her medicine, to take care of her personal needs and grooming, or to go places. (Tr. 237).  She could pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 238).  She was able to pay attention for one (1) hour at most in one (1) sitting, could finish what she started, had difficulty following spoken instructions if "there [were] too many steps," and could follow written instructions well, but would "often lose [her] place."  (Tr. 240).  She was able to handle stress relatively well, unless she was having a Fibromyalgia flare-up, and changes in routine often caused a flare-up of her Fibromyalgia because they would cause her to forget her medication or would involve new challenges that led to new difficulties.  (Tr. 241).

7

Socially, Plaintiff left her house about every other day, and was able to drive a car and go out alone when doing so.  (Tr. 238).  She enjoyed reading daily, sewing, embroidering, painting, scrapbooking, and going to museums; however, since her illnesses, injuries, or conditions began, she only rarely went to museums because she was not longer able to stand or walk for any length of time, would lose concentration while reading and sewing, and "rarely [had] enough mental and/ or physical energy for anything else." (Tr. 239).  She spent time with others no more than once a week for one (1) to two (2) hours at a time, used the computer, emailed friends, and went to the grocery store and post office on a regular basis.  (Tr. 239).  She did not have problems getting along with others. (Tr. 240).

Plaintiff completed a Supplemental Function Questionnaire for fatigue.  (Tr. 243).  Plaintiff stated that she began experiencing fatigue in early 2003 that was associated with the onset of a herniated disc at the C5-C6 level.  (Tr. 243).  Her level of fatigue had increased since that time, even after surgery for the disc in April of 2003.  (Tr. 243).  Her fatigue was worse at the end of the day, after she "cleaned [and ran] errands." (Tr. 243).  She frequently felt fatigued upon waking up, and would go back to bed.  (Tr. 243).  She experienced her fatigue all day, every day, with varying degrees, and it was relieved by rest, sleep, and occasional

stretching.  (Tr. 243).  Plaintiff was taking the following medications at the time she completed this form: Tramadol, Bupropion, Soma, Etodolac, Amitriptyline, Hydrocodone, Cymbalta, and Nortrel.  (Tr. 243).  Plaintiff stated that these medications had an effect on her fatigue, and that the Soma only sometimes temporarily helped.  (Tr. 243).

Plaintiff also completed a Supplemental Function Questionnaire for pain. (Tr. 244).  Her pain seemingly began in 2002 when she herniated her disc.  (Tr. 244).  When asked to describe her pain, she stated that it was a very deep pain that started in her bones, could be sharp and burning in her legs and feet, and made her feel like she had been "beaten up."  (Tr. 244).  She sometimes had pain when things would touch her skin, and there would be times when an area such as her legs would hurt more than another area such as her back.  (Tr. 244).  Her pain had continually increased since it began, with new pain in new places that resulted in more surgeries, more medications, and more limitations.  (Tr. 244).  Her pain was located everywhere, including her neck, joints, and both her deep and superficial muscles.  (Tr. 244).  When asked where her pain spread, she reiterated that it was everywhere, but that if a specific joint was sore, it would spread from there.  (Tr. 244).  The activities that caused her to have pain included standing, walking, sitting for long periods, rainy weather, lifting, and carrying.  (Tr. 244).  Her pain

9

was worse in the mornings upon awakening because of laying in bed all night and then later in the evening due to any activity throughout the day.  (Tr. 244).  Her pain never went away.  (Tr. 244).  Her eating habits had changed due to the pain, and she had gained fifty (50) to sixty (60) pounds.  (Tr. 245).  The pain medications she was taking included Tramadol three (3) times daily since May of 2005, and Hydrocodone as needed when the pain was severe since approximately January of 2006.  (Tr. 245).  The Tramadol would relieve some pain for about four (4) to six (6) hours, but did not relieve all her pain.  (Tr. 245).  Plaintiff engaged in stretching, biofeedback, light massage, physical therapy, and rest to relieve the pain.  (Tr. 245).

At her hearing, Plaintiff alleged that the following combination of physical problems prevented her from being able to work since July of 2008: Fibromyalgia, orthopedic problems including lumbar radiculopathy, degenerative disc disease ("DDD"), spondylosis, post surgical cervical spine problems, obesity, and depression.  (Tr. 33-34).  Regarding her school and work history, Plaintiff stated that her job at Way Point ended due to lay offs, her job at Eye Group of Lancaster ended because she quit to work at the Department of Public Welfare in Lancaster County, a job she eventually quit due to her Fibromyalgia, and that her job at Zipspan ended because she her husband moved to New Mexico, where she

obtained her bachelor's degree in cultural anthropology.  (Tr. 37-38).  She testified

that she had not worked in her degree field at all since obtaining her degree.  (Tr.

37).  She testified that she was able to fully communicate in English, and to add,

subtract, and perform simple arithmetic.  (Tr. 37).  Plaintiff testified that at the

time of her alleged onset date of July 20, 2008, she applied for and received

unemployment compensation benefits.  (Tr. 36).

Regarding mental health treatment, Plaintiff testified that she did not have

any inpatient hospitalizations, intensive outpatient treatment, group therapy, or

individual therapy.  (Tr. 40-41).  She had mental health medications prescribed to

her by her family doctor, but did not have any treatment by any mental health

professional.  (Tr. 41-42).  When asked to describe her depression, Plaintiff stated

that her depression was related strictly to the Fibromyalgia because it had taken

over her life, and that the depression caused a lack of motivation.  (Tr. 42).

Regarding the Fibromyalgia, Plaintiff acknowledged that there were three

(3) areas of treatment.  (Tr. 42).  The first area was exercise, and Plaintiff testified

that she engaged in exercise four (4) days a week for two (2) hours each time,

including walking for a half hour to forty-five (45) minutes, and stretching the

remainder of the time.  (Tr. 42-43).  The second treatment area was medication

excluding pain medication and including anti-inflammatories, and Plaintiff

11

testified that she took anti-inflammatories and narcotic pain medication as prescribed by her family doctor, John Conwell, M.D. (Tr. 43-44). She saw a Rheumatologist before her alleged onset date, but not within the relevant time period from her onset date to the date of the hearing. (Tr. 44). The third area of treatment for Fibromyalgia is a referral for pain management, and Plaintiff testified that she had a referral to a formal pain management program at Key Management Center of Lancaster during the relevant time period. (Tr. 44-45). Plaintiff testified that her treatment at Key Management Center was cut short after she received two (2) separate lumbar steroid injections with no improvement. (Tr. 45). She admitted that she had not learned about pain management techniques. (Tr. 45). She testified that, at the time of the oral hearing, she had recently started Lyrica after her date of last insured, and that it was going "all right" with the Lyrica, even allowing Plaintiff to take strong pain medications less frequently, but that she experienced some negative side effects. (Tr. 47). Regarding other medical conditions, Plaintiff testified that she had surgery on her left hand for a rheumatoid cyst in March of 2009.

When asked to describe a typical day from the past summer of 2012, Plaintiff stated that she would wake up anytime between six (6) o'clock to eleven (11) o'clock in the morning, take her medications, go to the bathroom, have

12

breakfast, get dressed, do small chores around the house such as cleaning up the

kitchen and doing the dishes and laundry, nap or rest for three (3) to four (4)

hours, have lunch, sometimes prepare dinner, take an evening nap with some

computer time sometimes, do simple things for thirty (30) to forty-five (45)

minutes such as paying bills or making phone calls, and then would be sedentary

at night.  (Tr. 50).  At some point during the day, she would also take a walk.  (Tr.

50).

When asked as to why she could not work, Plaintiff testified that the pain

from the Fibromyalgia was severe enough that she was not able to sit down or

stand for an extended period of time, meaning a half an hour at most.  (Tr. 51).

She stated that she could not find anybody willing to hire her because the time she

could work varied greatly.  (Tr. 52).  When asked if she had anything else to tell

the ALJ, she stated that she found it very difficult to do anything productive due to

her Fibromyalgia and medications, which resulted in decreased physical stamina

and mental concentration.  (Tr. 52).

Plaintiff also testified that the Soma gave her certain side effects, including

lack of concentration, drowsiness, and physical instability.  (Tr. 53).  She stated

that her sleep was often interrupted, and that she seldom slept for more than four

(4) hours of restful sleep at a time.  (Tr. 54).  She would wake at two (2) o'clock in

the morning, and would be wide awake for the rest of the night.  (Tr. 54).

With regards to activities Plaintiff engaged in, when asked by the ALJ why a medical report from 2013 stated that she engaged in reading, sewing, crafting, and camping, Plaintiff explained that these were activities she enjoyed, but that she was not able to do as much as she used to, aside from reading maybe two (2) to three (3) pages daily due to lack of concentration.  (Tr. 56).

**MEDICAL RECORDS**

Before the Court addresses the ALJ's decision and the arguments of counsel, Plaintiff's relevant mental health medical records will be reviewed in detail, beginning with records from her alleged disability onset date of July 20, 2008 through the date of last insured of December 31, 2012.

On January 29, 2009, Plaintiff had an x-ray of her left wrist performed at Ephrata Community Hospital.  (Tr. 315).  The results were that she did not have an acute fracture or dislocation or any focal osseous abnormality.  (Tr. 315).

On February 6, 2009, Plaintiff had an appointment with Brian Keener, M.D. of Lancaster Orthopedic Group for pain and prominence over her left wrist.  (Tr. 331).  She stated her pain worsened with any type of thumb movement, particularly reading, sewing, or jewelry making, that it was a five (5) out of ten (10), and that it was constant and dull in nature.  (Tr. 331).  An examination of her

14

upper extremities revealed full range of motion of the shoulders, elbows, wrists, and fingers, and pain with extremes of wrist flexion and extension in her thumb. (Tr. 331).  An exam of her right hand revealed no pain and intact sensation.  (Tr. 331).  An exam of her left hand revealed a "slightly more prominent radial styloid," pain over the first dorsal compartment, intact sensation, and a brisk capillary refill.  (Tr. 331-332).  Dr. Keener injected Plaintiff's left wrist with a corticosteroid to alleviate the pain, and scheduled a follow-up for three (3) to four (4) weeks later.  (Tr. 332).

Plaintiff had an appointment with Dr. Richard Reese at Lancaster Rheumatology Associates on March 13, 2009, but the notes from this appointment are entirely illegible.  (Tr. 307).  Plaintiff also had an appointment with Dr. Keener for De Quervain's tenosynovitis and possible cyst in her left hand.  (Tr. 319).  Dr. Keener diagnosed Plaintiff with De Quervain's tenosynovitis, and scheduled a release surgery, as a prior cortisone injection did not improve her wrist pain.  (Tr. 319).

On March 25, 2009, Plaintiff underwent surgery performed by Dr. Keener. (Tr. 329).  During this operation, Dr. Keener performed a left first dorsal compartment release for De Quervain's tenosynovitis.  (Tr. 329).

On April 6, 2009, Plaintiff had an appointment with Dr. Keener at Lancaster

Orthopedic Group.  (Tr. 318).  She reported that post left De Quervain's release surgery on March 25, 2009, her pain in her left wrist was much improved since before surgery, but she still had some discomfort and was hesitant to use her hand too much for weights.  (Tr. 318).  Her exam revealed a well-healed incision, mild swelling, and intact sensation.  (Tr. 318).  Plaintiff was scheduled for a follow-up appointment for two (2) weeks later.  (Tr. 318).

On May 15, 2009, Plaintiff had an appointment with Richard A. Moraga, M.D. for chronic pain after being referred by Dr. Reese.  (Tr. 316).  In the History of Present Illness section, it was noted that Plaintiff presented with significant pain, was being seen through the Fibromyalgia program, and had been treated with Elavil, Tramadol, Hydrocodone, Cymbalta, and Soma as needed.  (Tr. 316).  In the Psychiatric History section, it was noted that she was not being formally treated for psychiatric or psychological reasons, but that when placed on Cymbalta for chronic pain, she became less moody, less sensitive, and less easily upset about things, but that she was not sure if it was helping her pain.  (Tr. 316).  She denied symptoms of clinical depression, reported refreshing sleep, was interested in normally enjoyable activities, denied feelings of guilt or hopelessness, had an "okay" appetite, and denied suicidal ideations.  (Tr. 316).  She reported her pain levels to be at a five (5) out of ten (10) at its worst the week prior to the

16

appointment.  (Tr. 316).  She stated that if she could further reduce her pain, she

would be able to engage in more physical activity.  (Tr. 317).  She also reported

being troubled by shin-splints, and that they hindered her ability to become more

active.  (Tr. 317).  She had sedentary hobbies, but wanted to go out and do things

outdoors like camping with her husband.  (Tr. 317).  She stated that in order to be

more active, she would need to be at a pain level of one (1) to two (2) out of ten

(10), and stated that she could live with some pain.  (Tr. 317).  Dr. Reese offered

to provide Plaintiff with relaxation training and biofeedback services, to which she

was amenable, and wanted Plaintiff to schedule further appointments once his

June schedule was made.  (Tr. 317).

On May 19, 2009, Plaintiff had an appointment at Lancaster General Pain

Management after being referred by Dr. Richard Reese for a Fibromyalgia

Assessment and Treatment plan.  (Tr. 305).  The findings from this assessment

were that Plaintiff's symptoms were consistent with Fibromyalgia because

Plaintiff had seventeen (17) out of eighteen (18) trigger points, muscle pain rated

at a four (4) to eight (8) out of ten (10), fatigue, sleep disturbance, cognitive

disorders, joint stiffness and limited range of motion ("ROM"), and difficulty with

interpersonal relationships.  (Tr. 305).  Her goals were to be able to exercise on a

regular basis, to eat better, to have less pain, and to take less medications.  (Tr.

305).  It was recommended that Plaintiff engage in twelve (12) physical therapy sessions to obtain an individualized exercise program, neuromuscular and movement re-education, manual therapy and trigger point management, and a progressive home exercise program, and to learn body mechanics and posture modalities.  (Tr. 305).  It was also recommended that Plaintiff receive occupational therapy for four (4) to eight (8) session for treatment of her left hand in relation to De Quervain's disease.  (Tr. 305).

On June 24, 2009, Plaintiff had an appointment with Dr. Conwell.  (Tr. 361).  She told Dr. Conwell that physical therapy was helping her Fibromyalgia, and that she was leaving for a camping trip on July 30, 2009.  (Tr. 361).  She took Soma once every two (2) weeks.  (Tr. 361).  She could not get in to see a Rheumatologist until August of 2009, and needed Vicodin and Soma before then. (Tr. 361).  Her Axis I diagnosis was Fibromyalgia.  (Tr. 361).  Her treatment plan included taking Vicodin and Soma "as per FS release of records [of] Dr. Reese, Rheumatology."  (Tr. 361).

On July 27, 2009, Plaintiff had an appointment with Dr. Conwell.  (Tr. 364). She reported that she recently underwent physical therapy, occupational therapy, and biofeedback.  (Tr. 364).  It was noted that Plaintiff was taking the following medications, but that they were not helping: Cymbalta, Tramadol, Amitriptyline,

Nortrel, and Soma.  (Tr. 364).  Plaintiff's Axis II diagnosis included Fibromyalgia.

(Tr. 364).  It was noted that Plaintiff was planning to follow-up with a

Rheumatologist and to file for disability.  (Tr. 364).

On January 28, 2010, Plaintiff had an appointment with Dr. Conwell.  (Tr.

363).   She reported that she had right wrist pain, felt depressed, had poor

motivation, and that the Tramadol had not been "much help."  (Tr. 363).  It was

noted that Plaintiff had a normal affect, good eye contact, and a normal speech

pattern, and that she was alert and oriented.  (Tr. 363).  Plaintiff's Axis I diagnosis

was De Quervain's tenosynovitis of her right wrist, and her Axis II diagnosis was

depression.  (Tr. 363).

On February 4, 2010, Plaintiff had an appointment with Dr. Keener for right

wrist pain that was constant, stabbing, and a five (5) out of ten (10) on a pain

scale.  (Tr. 333).  She was diagnosed with De Quervain's tenosynovitis of her right

wrist, and scheduled for the same surgery she had on her left wrist.  (Tr. 333).

On February 10, 2010, Plaintiff underwent surgery performed by Dr.

Keener.  (Tr. 335).  Dr. Keener performed a right De Quervain's release, and

Plaintiff tolerated the procedure well.  (Tr. 335).

On March 1, 2010, Plaintiff had an appointment with Dr. Keener for follow-

up after surgery on her right wrist for De Quervain's tenosynovitis.  (Tr. 328).

Plaintiff stated that her pain was getting better, and her exam revealed that her incision looked good, she was neurovascularly intact, and she could move her wrist and thumb well.  (Tr. 328).  Dr. Keener's treatment plan involved scar tissue massage and avoidance of heaving lifting for a week or two (2).  (Tr. 328).

On April 30, 2010, Plaintiff had an appointment with Dr. Conwell.  (Tr. 366).  Plaintiff reported that her Fibromyalgia was stable, and an exam revealed that her gait and speech were normal, she was alert and oriented, and that she had a pleasant affect and good eye contact.  (Tr. 366).  Her Axis II diagnosis was depression, and her Axis III diagnosis was Fibromyalgia.  (Tr. 366).

On June 2, 2011, Plaintiff had an appointment with Dr. Conwell.  (Tr. 371).  At this appointment, Plaintiff reported that she had poor motivation, and that the Wellbutrin was not helping.  (Tr. 371).  Her Axis I diagnosis was Fibromyalgia, her Axis III diagnosis was feet pain, and her Axis IV diagnosis was feet numbness.  (Tr. 371).  Plaintiff asked for Vicodin and Soma for her pain so that she could go on vacation.  (Tr. 371).  Her medications list included Cymbalta, Soma, Vicodin, Tramadol, Buproprion, Etodolac, and Amitriptyline.  (Tr. 371).

On June 30, 2011, Jonathan Rightmeyer, Ph.D. completed a Psychiatric Review Technique ("PRT") form by reviewing Plaintiff's medical records.  (Tr. 85-86).  First, Dr. Rightmeyer concluded Plaintiff had the following medically

determinable impairments: (1) Fibromyalgia; (2) Osteoarthrosis; (3) Carpal Tunnel

Syndrome; (4) Obesity; and (5) an affective disorder under Listing 12.04.[7]  (Tr.

85).  He performed the PRT, and upon review of the "B" criteria for this Listing,

found that Plaintiff had mild restriction in activities of daily living, mild

difficulties in maintaining social functioning, mild difficulties in maintaining

concentration, persistence, or pace, and no repeated episodes of decompensation.

---

7.  Listing 12.04, Affective Disorders, consists of paragraph A criteria that
involves a set of medical findings, paragraph B criteria that involves a set of
impairment-related functional limitations, and paragraph C criteria that involves a
set of additional functional limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §
12.00(A).  The required level of severity for Listing 12.04 is met when "the
requirements in both A and B are satisfied, or when the requirements in C are
satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  The paragraph B
requirements of Listing 12.04 requires two (2) of the following: (1) marked
restriction of activities of daily living; (2) marked difficulties in maintaining social
functioning; (3) marked difficulties in maintaining concentration, persistence or
pace; or (4) repeated episodes of decompensation, each of extended duration.  20
C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).  Listing 12.04 paragraph
C requires demonstration of a medically documented history of a chronic affective
disorder of at least two (2) years duration that has caused more than a minimal
limitation of ability to do basic work activities, with symptoms or signs currently

attenuated by medical or psychosocial support, and one (1) of the following: (1)
repeated and extended episodes of decompensation; (2) a residual disease process
that has resulted in such marginal adjustment that even a minimal increase in
mental demands or change in the environment would be predicted to cause the
individual to decompensate; or (3) a current history of one (1) or more years'
inability to function outside a highly supportive living arrangement, with an
indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 12.04(C)(1)-(3).

Dr. Rightmeyer also opined that the evidence did not establish the presence of the "C" criteria for Listing 12.04. (Tr. 86).  Dr. Rightmeyere explained that Plaintiff's activities of daily living were good, that Plaintiff did not see a psychiatric specialist for treatment of her psychiatric symptoms, and that her primary care physician treated her only for pain and mild depression with Wellbutrin.  (Tr. 86).  Dr. Rightmeyer then completed a Mental Residual Functional Capacity ("RFC") form.  (Tr. 86).  Dr. Rightmeyer opined that while Plaintiff had the aforementioned medically determinable impairments that could reasonably be expected to produce pain or other symptoms, her statements regarding the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated because Plaintiff was able to carry out activities of daily living independently.  (Tr. 86).  Dr. Rightmeyer stated Plaintiff was able to care for her personal needs, shop, drive, do household chores, and take her medications.  (Tr. 86).  He also stated that, despite her symptoms, she rarely sought treatment with any medical providers other than her primary care physician, and she had "significant gaps in her treatment history."  (Tr. 86).

On July 19, 2011, a Physical RFC assessment was performed by Nathan Mackneer, SDM (single decision maker).  (Tr. 87).  Mr. Mackneer opined that Plaintiff could occasionally lift and/ or carry up to twenty (20) pounds, frequently

lift and/ or carry up to ten (10) pounds, stand and/ or walk and sit for about six (6) hours in an eight (8) hour workday, could engage in unlimited pushing and pulling within the aforementioned weight restrictions, and she did not have postural, manipulative, visual, communicative, or environmental limitations. (Tr. 87). Mr. Mackneer explained that he based his conclusions on three (3) particular exams, one (1) of which revealed that Plaintiff's Fibromyalgia and gait were stable, one (1) of which made no mention of fatigue, tenderness, or Fibromyalgia, and one (1) of which noted positive tender points bilaterally in Plaintiff's paralumbar regions, left elbow and wrist, normal sensation in her feet bilaterally, and no hypesthesia, warmth, or erythema. (Tr. 87).

On September 26, 2011, Plaintiff had an appointment with Dr. Conwell. (Tr. 385). She checked the following as her main problems: (1) asthma/ wheezing; (2) sinus trouble; (3) indigestion or heartburn; (4) bruising easily; (5) numbness and/ or tingling sensations in her feet; (6) arthritis; (7) foot pain; (8) cold numb feet; and (9) depression. (Tr. 385). Plaintiff reported that she had trouble with motivation and trouble sitting and standing for extended periods of time due to Fibromyalgia, and that her feet would become red, sensitive to the touch, and would lose sensation. (Tr. 387). Her medications list included Tramadol, Etodolac, Amitriptyline, Nortrel, Cymbalta, and Wellbutrin. (Tr. 385). Her

diagnoses included Fibromyalgia, feet pain, feet hypesthesia, feet numbness, mild hyperlipidemia, and obesity.  (Tr. 388).  Dr. Conwell recommended that Plaintiff wean off of Wellbutrin, and decrease her Cymbalta dosage.  (Tr. 388).  She was encouraged to engage in regular aerobic exercise, and was counseled on decreasing her carbohydrate intake to lower her weight.  (Tr. 388).

On October 21, 2011, Plaintiff had an appointment with Dr. Conwell.  (Tr. 389).  Plaintiff reported that she had bilateral foot pain, and that it felt like she was "walking on peas."  (Tr. 389).  She also stated that sometimes her pain medications were not adequate, even if she took two (2) Vicodin at a time.  (Tr. 389).  It was noted the Plaintiff was able to ambulate freely, and that she had bilateral foot hypesthesia.  (Tr. 389).  Her Axis II diagnosis was foot pain, her Axis III diagnosis was foot numbness, and her Axis IV diagnosis was Fibromyalgia.  (Tr. 389).

On January 3, 2012, Plaintiff had an appointment with Dr. Conwell.  (Tr. 390).  Plaintiff reported she had been having more joint pain, pain bilaterally in her knees and ankles, and bilateral foot numbness.  (Tr. 390).  Her Axis I diagnosis was Fibromyalgia, her Axis II diagnosis was feet pain, her Axis III diagnosis was feet numbness, and her Axis IV diagnosis was depression.  (Tr. 390).  Her prescribed medications included Cymbalta, Zoloft, and Iodine.  (Tr.

390).

On July 20, 2012, Plaintiff underwent an MRI of her lumbar spine without contrast at Ephrata Community Hospital due to low back pain, loss of sensation in her feet, and Fibromyalgia. (Tr. 444). The MRI revealed the following: (1) mild narrowing of the neural foramina at L4-L5, secondary to moderate facet degenerative change; (2) no significant disc protrusion or substantial canal or neuro foraminal stenosis; and (3) a few hyperintensities in the kidneys that may represent small cysts. (Tr. 444).

On August 13, 2012, Plaintiff had an appointment at the Pain Management Center of Ephrata ("PMCE") with Matthew Midcap, M.D., with a chief complaint of low back and bilateral lower extremity pain, numbness, and tingling from her knees down into her feet. (Tr. 409). It was noted that Plaintiff had not worked in two (2) years, and that she had been fairly sedentary. (Tr. 409). Her past medical history was remarkable for asthma, depression, anemia, arthritis, and Fibromyalgia. (Tr. 409). Her medications included Amitriptyline, Nortrel, Sertraline, Etodolac, Tramadol, Hydrocodone, and Soma. (Tr. 409). Her exam revealed that she stood without effort, walked with a nonantalgic gait, had a diminished ROM in her lumbar spine in flexion and extension, had tenderness throughout her thoracolumbar paraspinous musculature and midline of her lower

back, had her major motor groups of her lower extremities rated at a five (5) out of five (5) neurologically speaking, had some hypesthesia over the lateral distal calves, had dysesthesia over the dorsum of both feet, and had no color change or swelling in her feet other than some trace pedal edema bilaterally.  (Tr. 409).  It was noted that she underwent an EMG that demonstrated bilateral S1 radiculopathy that was greater on her left side than her right, and that she had lumbar DDD and lumbar spondylosis.  (Tr. 409).  The plan was to bring her back for a lumbar epidural in the near future.  (Tr. 409).

On September 5, 2012, Plaintiff had an appointment at PMCE to receive a lumbar epidural performed by Dr. Midcap.  (Tr. 407).  Her diagnoses included lumbar radiculopathy, lumbar DDD, lumbar spondylosis without myelopathy, depression, and Fibromyalgia.  (Tr. 407).  She received the epidural, and was scheduled for a follow-up appointment.  (Tr. 407).

On September 26, 2012, Plaintiff had an appointment at PMCE for an evaluation of her low back and leg pain.  (Tr. 405).  Based on her response to a prior lumbar epidural on September 5, 2012, it was planned for Plaintiff to have another epidural at this appointment.  (Tr. 405).  Since that September 5, 2012 appointment, it was noted that Plaintiff had been able to sew.  (Tr. 405).  Her assessment diagnoses included lumbar radiculopathy, lumbar DDD, lumbar

spondylosis without myelopathy, depression, and Fibromyalgia.  (Tr. 405).

Plaintiff underwent an epidural performed by Dr. Midcap, and was scheduled for a

follow-up in two (2) weeks.  (Tr. 406).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

27

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant

numbers either in the region where such individual lives or in
several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546,

550 (3d Cir. 2004).  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012.  (Tr. 17).  The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled.  (Tr. 17-23).

At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful work activity from her alleged onset date of July 20, 2008 through her date of last insured of December 31, 2012.  (Tr. 17).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "Fibromyalgia; and obesity (20 C.F.R. 404.1520(c))."  (Tr. 17).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 19).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with exceptions.  (Tr. 19).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] had the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except: sit and stand alternative at will; occasionally climb stairs; avoid ropes, ladders, scaffolding, and poles; occasionally

---

8.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> stoop to waist, kneel, and squat; never crawl on hands and
> knees or feet; occasionally reach overhead bilaterally,
> occasionally avoid concentrated exposure to extreme cold,
> extreme heat, extreme humidity, and wet, water, and liquids;
> and never work around or with hazardous machinery, high
> exposed places, and large fast moving machinery on the
> ground. [Plaintiff] is limited to unskilled work.

(Tr. 19).

At step five of the sequential evaluation process, considering the Plaintiff's

age, education, work experience, and RFC, the ALJ determined "there are jobs that

exist in significant numbers in the national economy that the [Plaintiff] can

perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 22).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between the alleged onset date of July 20,

2008, through the date last insured, December 31, 2012.  (Tr. 23).

## DISCUSSION

In her complaint and brief in support, Plaintiff is alleging that: (1) the ALJ

erred in finding several impairments, including Plaintiff's lower back problems,

depression, arthritis, and fatigue, as non-severe; (2) the ALJ "unreasonably

ignored" Plaintiff's subjective complaints of pain in determining she could

perform light duty, unskilled work; (3) the ALJ failed to consider the combined

impact of Plaintiff's conditions on her RFC; and (4) the ALJ "illogically

concluded that [Plaintiff] could not perform her past relevant work, which was light duty, but could perform a series of other, similar, but more strenuous light-duty jobs." (Doc. 12, pp. 2-3).   Defendant disputes these contentions.  (Doc. 13).

### 1.   **Impairment Severity**

Plaintiff alleges that, at step two, the ALJ erroneously concluded that her depression, chronic pain, lumbar radiculopathy, DDD, spondylosis, hair fractures, De Quervain's Syndrome, cervical spine problems, depression, and fatigue were erroneously found to be non-severe because they were not considered in combination with each other and with her obesity and Fibromyalgia that the ALJ found to be severe.

An impairment or combination of impairments is considered to be severe for step two purposes if it significantly limits the claimant's physical or mental ability to engage in basic work activities.  Jefferson v. Colvin, 2015 U.S. Dist. LEXIS 55365, *23 (M.D. Pa. April 10, 2015) (Kane, J.).  According to 20 C.F.R. § 416.921(b), "basic work activities" is defined as the ability and aptitude necessary to do most jobs including:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling;
>
> (2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R.§ 416.921(b)(1-6).  An impairment is considered non-severe if it is a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to perform basic work activities.  20 C.F.R. § 416.921(a); SSR 96-3p.  At step two, the claimant has the burden to demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."  SSR 85-28.  Thus, "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003).

In a case with facts similar to the one at hand, the United States Court of Appeals for the Third Circuit held that the administrative law judge's decision that the plaintiff's lower back problems were non-severe was not supported by substantial evidence because: (1) this impairment was supported by objective medical evidence, such as x-rays; and (2) Plaintiff received several epidural

injections into her lumbosacral spinal region to alleviate pain.  See McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 361 (3d Cir. 2004) (holding that "We believe that viewing the record in its entirety, . . . no reasonable person could fail to conclude that McCrea's physical conditions were 'severe' under the de minimis interpretation of that term currently endorsed by the Commissioner.").

In the case at hand, the ALJ found that only Plaintiff's obesity and Fibromyalgia were "severe" impairments.  However, in the light of the decision rendered in McCrea, it is determined that the ALJ erred in determining that Plaintiff's lower back impairments, including DDD, spondylosis, lumbar radiculopathy, and post surgical cervical spine problems, were non-severe because the objective medical evidence shows more than a slight abnormality.  On July 20, 2012, Plaintiff underwent an MRI of her lumbar spine without contrast at Ephrata Community Hospital due to low back pain, loss of sensation in her feet, and Fibromyalgia.  (Tr. 444).  The MRI revealed mild narrowing of the neural foramina at L4-L5, secondary to moderate facet degenerative change.  (Tr. 444).

On August 13, 2012, Plaintiff had an appointment at the Pain Management Center of Ephrata ("PMCE") with Matthew Midcap, M.D., with a chief complaint of low back and bilateral lower extremity pain, numbness, and tingling from her knees down into her feet.  (Tr. 409).  Her exam revealed that while stood without

effort and walked with a nonantalgic gait, she had a diminished ROM in her lumbar spine in flexion and extension, had tenderness throughout her thoracolumbar paraspinous musculature and midline of her lower back, had some hypesthesia over the lateral distal calves, and had dysesthesia over the dorsum of both feet, and had no color change or swelling in her feet other than some trace pedal edema bilaterally. (Tr. 409). It was noted that she underwent an EMG that demonstrated bilateral S1 radiculopathy that was greater on her left side than her right, and that she had lumbar DDD and lumbar spondylosis. (Tr. 409).

Furthermore, Plaintiff's lower back problems had more than a minimal effect on her ability to perform basic work activities. In the Supplemental Function Questionnaire filled out in July of 2013, Plaintiff indicated that the activities that caused her to have pain included standing, walking, sitting for long periods, lifting, and carrying, all of which fall within the scope of the aforementioned definition of "basic work activities." (Tr. 244). At her hearing, with regards to activities Plaintiff engaged in, when asked by the ALJ why a medical report from 2013 stated that she engaged in reading, sewing, crafting, and camping, Plaintiff explained that these were activities she enjoyed, but that shw was not able to do, aside from reading maybe two (2) to three (3) pages daily due to lack of concentration. (Tr. 56).

As such, the ALJ's failure to find Plaintiff's lumbar problems as non-severe is not supported by substantial evidence because, as discussed, these aforementioned lumbar impairments were supported by objective medical evidence, including MRI and EMG results, required epidural injections for treatment, and had more than a minimal impact on Plaintiff's ability to perform basic work activities.  Regarding the remainder of impairments Plaintiff alleges the ALJ erroneously concluded were non-severe, because remand is already warranted on the basis that Plaintiff's lumbar problems were severe, it is unnecessary to determine whether these remaining impairments were severe.

## CONCLUSION

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), Plaintiff's appeal will be granted, the decision of the Commissioner denying disability insurance benefits will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: June 1, 2015

**/s/ William J. Nealon**
**United States District Judge**

38